UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| UNITED RENTALS HIGHWAY TECHNOLOGIES, INC., | ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | 1:05-cv-0571-SEB-VSS |
| INDIANA CONSTRUCTORS, INC., et al., Defendants. | ) ) | |

**ENTRY GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT,
DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT,
AND DENYING PLAINTIFF'S REQUEST FOR ORAL ARGUMENT**

This case is before the Court on cross-motions for summary judgment.

Defendants, Laborers' International Union of North America – State of Indiana District

Council, and Laborers' International Union of North America – Local Union Nos. 41, 81,

120, 204, 213, 274, 561, 645, 741, 795, 1047, and 1112 (hereinafter referred to

collectively as "the Laborers"), filed a Motion for Summary Judgment [Docket No. 55]

on February 27, 2006.  This motion was joined by Defendant Indiana Constructors, Inc.,

on February 28, 2006 [Docket No. 62].  Subsequently, on April 6, 2006, Plaintiff United

Rentals Highway Technologies, Inc., filed its own Motion for Partial Summary Judgment

[Docket No. 71].  United Rentals also filed a Local Rule 7.5 Request for Oral Argument

on Motions for Summary Judgment [Docket No. 72] on that date.[1]

---

[1] Plaintiffs' Request for Oral Argument, based on Local Rule 7.5, is hereby DENIED.

(continued...)

For the reasons detailed in this entry, we GRANT Defendants' Motion for Summary Judgment and DENY Plaintiff's Motion for Partial Summary Judgment.

### Factual Background

Plaintiff United Rentals Highway Technologies, Inc. ("United Rentals") is a Massachusetts corporation with its principal place of business in Connecticut. Am. Compl. ¶ 2. United Rentals has two offices in Indiana, in Indianapolis and Wanatah. Id. ¶ 24. United Rentals performs highway traffic control work throughout Indiana.

Defendant Indiana Constructors, Inc. ("ICI") is an Indiana corporation with its principal place of business in Indianapolis. ICI is a trade association that represents its member contractors ("ICI Contractors"[2]) in collective bargaining with labor unions, including Defendant Laborers.[3] Am. Compl. ¶ 3. ICI Contractors perform nearly all of the highway construction work done in Indiana. Id. ¶ 22. ICI Contractors have frequently subcontracted traffic control work to highway traffic control companies,

---

[1](...continued)
The briefings in this cause are both thorough and prolix. Plaintiffs requested and obtained from this court leave to file excess pages in their pleadings. Therefore, we are able to reach our decision based upon these pleadings, and oral argument on the issues before us is unnecessary.

[2] There are thirty-four ICI-member highway contractors who have assigned their bargaining rights to ICI for the purpose of labor negotiations with the Laborers. In addition, over two hundred other contractors have agreed to be bound by the current collective bargaining agreement between the Laborers and ICI. Laborers' Mem. at 2. These contractors are collectively referred to as the "ICI Contractors."

[3] Collective bargaining agreements for ICI are negotiated by its Labor Relations Division, known as "ICI-LRD."

including United Rentals.  Id. ¶ 23.  United Rentals states that the "substantial majority"

of its revenue from traffic control work in Indiana comes from contracts with ICI

Contractors.  Id. ¶ 27.

Defendant Laborers International Union of North America – State of Indiana

District Council (the "District Council") is an unincorporated labor organization,

principally based in Terre Haute, Indiana.  The District Council represents Indiana

workers through local chartered unions, including Local Union Nos. 41, 81, 120, 204,

213, 274, 561, 645, 741, 795, 1047, and 1112, each named as a defendant here.  Id. ¶¶ 5-

16.  Collectively, the District Council and the twelve named local unions represent more

than nine thousand highway and building construction workers throughout Indiana.

Laborers' Mem. at 2.


*Collective Bargaining Relationships Among The Parties*

United Rentals has a collective bargaining relationship with United Construction

Workers Local 18 of the Christian Labor Association of the U.S.A. ("CLA").  CLA is

certified, under Section 9(a) of the National Labor Relations Act ("NLRA"), as the

exclusive collective bargaining representative for United Rentals's employees.  Id. ¶ 29.

The collective bargaining agreement between United Rentals and CLA was effective until

December 31, 2005, for the Indianapolis facility, and until April 30, 2006, for the

Wanatah facility.  Id.  United Rentals asserts that, because its relationship with CLA is

pursuant to Section 9(a) of the NLRA, rather than Section 8(f), "United Rentals would not

be legally able to abandon CLA upon the expiration of its current collective bargaining agreement with CLA."[4]  Id.  United Rentals does not have a collective bargaining relationship with the Laborers, and asserts that it "is legally prohibited from signing a labor agreement with Defendant Laborers, because [it] has a collective bargaining relationship with . . . CLA."  Id. ¶¶ 30, 61.

*Traffic Control Work*

The highway traffic control work performed by United Rentals consists of several different activities meant to ensure the safety of the motoring public and highway construction workers.  This work includes delivering to the construction site, placing, and later picking up barricades, barrels, traffic delineation devices, and signage.  United Rentals's work also includes "striping," which is the placement of temporary or permanent pavement markings.  Am. Compl. ¶ 26; Pl.'s Am. Mem. at 4.  The Laborers state that, in addition to the above tasks, traffic control work also includes "flaggers," who direct traffic through a construction zone, and "watchmen," who oversee the construction site to ensure that traffic control devices are functioning and are properly

_____

[4] Section 8(f) of the NLRA (29 U.S.C. § 158(f)) allows for employers in the building and construction industry to form "prerecognition agreements" with labor unions.  Prerecognition agreements allow an employer to agree to bargain with the union for a limited period of time, but the employer does not formally recognize the union.  In contrast, in a more permanent Section 9(a) relationship, "once a union has become the representative of a majority of the employees in an appropriate bargaining unit, the employer is required to bargain with the union as the employees' bargaining representative."  NLRB v. Goodless Bros. Elec. Co., 285 F.3d 102, 104-05 (1st Cir. 2002) (quoting NLRB v. Goodless Elec. Co., 124 F.3d 322, 324 (1st Cir. 1997)).

placed.[5]  Laborers' Mem. at 5.

United Rentals asserts that its employees are at the construction site only for approximately one hour, on average, for each project.  It states that the majority of its employees' time is spent driving between sites or loading and unloading equipment at United Rentals's property.  Am. Compl. ¶ 26.

Traffic control work requires the use of various tools and machinery at the site of construction.  For example, barricades may be affixed to the ground with sandbags or other devices.  Striping can be affixed by hand or by machine and may involve the use of shot blasters and grinders to remove paint and markings on the road surface.  Laborers' Mem. at 6.

*The 2004 Collective Bargaining Agreement*

In 2004, the Laborers and ICI-LRD negotiated a modification of their collective bargaining agreement involving subcontracts entered into by ICI Contractors.  The 2004 collective bargaining agreement was made effective as of April 1, 2004.  Laborers' Mem. at 7.  The subcontracting clause, in Article XXV of the agreement, provides:

> The Employer [the ICI Contractor] shall not contract any work covered by this Agreement to be done at the site of construction, alterations, repairs or any new construction or any other work to any person, firm or company that does not have an existing labor agreement or will not sign an agreement, with the

---

[5] United Rentals, however, notes that its employees do not work as flaggers.  Pl.'s Am. Mem. at 5.

Union [Laborers] covering such work within the scope of this Agreement.[6]

The scope of the work "covered by" the 2004 agreement, including the

subcontracting clause, is described in Article I of the agreement and provides, in relevant

part, that:

> [Highway construction] shall include construction, modifications, additions or
> repairs of roads and streets (including roads and streets in housing projects)
> and construction incidental thereto; alleys, guard rails, fences, parkways,
> parking lots and parking areas; rest parks, airports, bridle paths, grading and/or
> draining of athletic fields to an outlet for the highways; all conduit and duct
> construction, sewage and waterworks improvements incidental to street and
> highway improvements, government defense projects, industrial and
> commercial projects, including schools and other governmental projects.[7]

Further, the "coverage" provision provides that coverage encompasses work under the

Laborers' jurisdiction as recognized in the District Council's "jurisdictional guidelines"

booklet, adopted in 1972.  This booklet includes the following description of "highway

construction":

> [W]ork in the excavation, preparation, concreting, asphalt bituminous concrete
> and mastic paving, paving, ramming, curbing, flagging, and surfacing of
> streets, ways, courts, underpasses, overpasses, bridges, approaches and slope
> walls and the grading and landscaping thereof and all other labor connected
> therewith. . . . [s]ignal men on all construction work defined herein, including
> traffic control signalmen at construction sites, or, flagmen for traffic on all
> work connected therewith, including resurfacing... [s]ignal [i]nstallation and

---

[6] Am. Compl. Ex. B.  This provision will hereinafter be referred to as the "subcontracting
clause."

[7] Am. Compl. Ex. A at 3.  The Laborers note that every collective bargaining agreement
since 1968 has included this language.  Laborers' Mem. at 7, citing Lee aff. Exs. A-M.

[r]oad [m]arking. . .[8]

The Laborers assert that they had sought inclusion of such a subcontracting clause in their collective bargaining agreement with ICI-LRD for some time.  They had proposed such language as long ago as in negotiations for their 1990 collective bargaining agreement with ICI-LRD, but that ICI-LRD "refused to agree to this language until the 2004 contract, when it accepted the Laborers' proposal in exchange for the Laborers' agreement to a new substance abuse policy."[9]  Laborers' Mem. at 3.  United Rentals notes that this was "a strike issue" for the Laborers.  Pl.'s Am. Mem. at 15.

The Laborers state that they proposed the 2004 subcontracting clause because they sought to preserve for their members "work that they had historically performed, but

---

[8] Laborers' Mem. at 7, citing Lee Aff., Ex. Q, pp. 5-6.

[9] Previous collective bargaining agreements between Laborers and ICI-LRD had not included such clauses.  For example, the 1999 agreement provided that:

> ICI-LRD encourages its members to utilize sub-contractors who are signatory to collective bargaining agreements with the Laborers Union. Such sub-contractors help to promote the peace and harmony of the job-site and to avoid labor dispute interruption of work. To help facilitate the utilization of signatory sub-contractors, each Contractor shall inquire of each of its sub-contractors whether such Contractor is signatory to an agreement with the Laborers, and if not, the Contractor shall notify the Laborers Union of the name, address and telephone number of such sub-contractor prior to the commencement of work by the sub-contractor who is not signatory.

> Further, any [sub-]contractor awarded a portion of the job-site work of a signatory Employer performing job-site construction work covered by this Agreement, shall pay wages, fringe benefit contributions, and abide by all terms and working conditions set forth in this Agreement while such sub-contractor is on the project.

Am. Compl. ¶ 35.

which in some instances had been subcontracted by ICI Contractors to employers who were not signatory to an agreement with the Laborers." Laborers' Mem. at 3. The Laborers state that one of their specific concerns was subcontracted traffic control work. They maintain that subcontracting of such work to nonsignatory subcontractors first became an issue of significance in the late 1980s, because, prior to that time, nearly all such work had been performed through ICI Contractors or subcontractors who were signatory to an agreement with the Laborers. Id. at 4. As traffic control subcontractors became more prevalent in the early to mid 1980s, ICI Contractors began subcontracting a significant amount of traffic control work, and several traffic control subcontractors (though not all) became signatory to collective bargaining agreement between ICI-LRD and the Laborers. Id.

*The Memorandum of Understanding*

Shortly after the 2004 collective bargaining agreement became effective, some ICI Contractors questioned when the subcontracting clause should begin to apply to non-signatory subcontractors, including United Rentals, who were party to a labor agreement with another labor organization. Laborers' Mem at 8; Am. Compl. ¶ 43; Pl.'s Am. Mem. at 15. The ICI-LRD and the Laborers met in June 2004 and agreed upon a "Memorandum of Understanding" ("MOU") to clarify this issue. Laborers' Mem. at 8.

Paragraph 1 of the MOU states that, for all work bid after May 25, 2004, contractors party to the collective bargaining agreement could not contract any work

covered by the agreement to anyone who did not have an existing labor agreement with the Laborers or would not sign such an agreement, *unless* paragraphs 2 and 3 applied. Am. Compl. Ex. C.

Paragraphs 2 and 3 of the MOU apply specifically to traffic control work, and provide an exception to the effective date provided in paragraph 1.  Paragraph 2 provides that an ICI Contractor could continue, until January 1, 2006, to subcontract traffic control work to companies that were not party to a labor agreement with the Laborers, so long as (a) the subcontractor had a labor agreement with another labor organization that covers traffic control work within the Laborers' jurisdiction, and (b) the subcontractor had performed work for that ICI Contractor between April 1, 2003 and April 1, 2004. Paragraph 3 defines such "traffic control site work" as including, but not limited to, line removal and surface preparation, driving of assigned vehicles on site, traffic control services, and installation and ongoing site maintenance of signs and traffic control devices.  Am. Compl. Ex. C; Am. Compl. ¶¶ 45-46.  After January 1, 2006, this exception ceased to be effective, and ICI Contractors could not employ subcontractors – traffic control or otherwise – who were not signatory to an agreement with the Laborers.

Therefore, under the MOU, ICI Contractors who had subcontracted traffic control site work to United Rentals between April 1, 2003, and April 1, 2004, could continue to do so until January 1, 2006.[10]  After January 1, 2006, no ICI Contractors could

---

[10] United Rentals states that it had not performed work for 15 out of the 34 ICI Contractors between April 1, 2003, and April 1, 2004.  Therefore, these 15 contractors could not

(continued...)

9

subcontract traffic control work to United Rentals, because United Rentals did not have a labor relationship with the Laborers.  Am. Compl. ¶ 47.

On August 13, 2004, Charles V. Kahl, Executive Director of ICI-LRD ("Mr. Kahl") issued a Memorandum to all ICI Contractors and Subcontractors reiterating the terms of the MOU.  The Memorandum confirmed the effective dates provided for in the MOU for traffic control site work by non-signatory subcontractors.  Am. Compl. Ex. D; Am. Compl. ¶¶ 48-50.

One of the ICI Contractors for which United Rentals had performed traffic control work between April 1, 2003, and April 1, 2004, was Milestone Contractors, L.P. ("Milestone").  Therefore, under the MOU, the subcontracting clause of the 2004 agreement should not have been applicable to work United Rentals performed for Milestone until January 1, 2006.  However, on March 14, 2005, Jim Terry, President and Field Representative of Local Union No. 274 ("Mr. Terry"), told United Rentals that it had been chosen to perform traffic control work for a Milestone project, that he wanted to discuss the "mandatory signatory clause," and that "it would benefit us both to sit down and talk."  Am. Compl. ¶ 54.  Mr. Terry states that he had forgotten at the time that United Rentals had an agreement with the CLA.  Mr. Terry did not file a grievance against United Rentals, and United Rentals performed the job for Milestone.  Laborers' Mem. at 11, citing Terry dep. 18-19.

---

[10](...continued)
subcontract traffic control site work to United Rentals, effective May 25, 2004.  Am. Compl. ¶ 53.

*NLRB Involvement*

On January 28, 2005, United Rentals filed charges with the National Labor Relations Board ("NLRB") against the District Council.  Laborers' Mem. at 9.  These charges alleged unfair labor practices – specifically, that the subcontracting clause and MOU violated NLRA Sections 8(e)[11] and 8(b)(4)(ii)(A), (B), and (C).  The claims alleged that the Laborers were attempting to use the subcontracting clause and the MOU to "expand the scope of their work to include, for the first time, traffic control work," and that the subcontracting clause and the MOU "were not protected by the Construction Industry Proviso to Section 8(e) of the NLRA, which permits on-site subcontracting agreements in the construction industry."  Id.  The NLRB investigated United Rentals's claims.  United Rentals subsequently withdrew its charges against ICI and the Laborers, for reasons not related to the case at bar.  Id. at 9-10.

On March 24, 2005, Gridlock Traffic Services – another traffic control subcontractor without a collective bargaining relationship with the Laborers – also filed an unfair labor practice charge against ICI and the Laborers  with the NLRB, alleging a violation of NLRA Section 8(e), based on the same arguments alleged by United Rentals. Id. at 10.  Rik Lineback, NLRB Regional Director, dismissed the charges.[12]  Gridlock

---

[11] ICI was also named as a charged party with respect to the 8(e) claim.  Laborers' Mem. at 9.

[12] Laborers' Mem. at 10, citing Lee Aff. Ex. T, U.  The dismissal letter, in part, states
(continued...)

Traffic Services appealed the dismissal to the Office of Appeals for the General Counsel

to the NLRB, which affirmed the dismissal, stating that the subcontracting clause was not

violative of Section 8(e), and that ICI and the Laborers had historically performed traffic

control work.  Laborers' Mem. at 10-11, citing Lee Aff. Ex. W.


*United Rentals's Allegations against Defendants Laborers and ICI*

United Rentals claims that the 2004 subcontracting clause, the MOU, the

memorandum issued by Mr. Kahl, and the statement by Mr. Terry constitute coercion,

and that "the Defendants have combined and conspired with each other . . . to carry out a

common plan to exclude United Rentals from the market for highway traffic control work

in the State of Indiana."  Am. Compl. ¶¶ 55-56.  United Rentals asserts that ICI and the

Laborers "have improperly and unlawfully used their market power in the highway

_____

[12](...continued)

that:

> With regard to the agreement between . . . [the] District Council and ICI, the
> evidence was insufficient to establish a violation. Thus, the agreement is between the
> Union and employers in the construction industry and, by its terms, is limited to
> work to be performed at the site of construction.
>      The investigation revealed that much of the work that the Charging Party
> contracted to perform for E&B and other ICI contractors was actually work to be
> performed at the jobsite. The Charging Party was responsible, among other things,
> for setting up and moving barriers, flashing arrow boards, and changeable message
> signs throughout the course of the road construction project. Additionally, it was
> responsible for both placing and removing wording and striping on the road surface.
> Thus, the evidence was insufficient to establish a violation of the Act since such
> on-site work is covered by the construction industry proviso to Section 8(e).

Lee Aff. Ex. U.

construction market for the purpose and effect of extending their reach into the highway traffic control market, thereby eliminating competition in the highway traffic control market and preventing United Rentals from performing any work for ICI Contractors." Id. ¶ 59.  United Rentals maintains that the subcontracting clause is "an illegal hot cargo clause" that will force it out of business in Indiana, will "unreasonably restrain trade in the market for the performance of highway traffic control work" in Indiana, and will "harm and eliminate competition in the market for highway traffic control work in the State of Indiana."  Id. ¶¶ 67, 69.

Specifically, United Rentals raises five claims based on Defendants' alleged illegal activity.  First, United Rentals asserts, as Count One, that Defendants' conduct constitutes "an illegal horizontal agreement, resulting in a group boycott and/or concerted refusal to deal," and violates Section 1 of the Sherman Act, 15 U.S.C. § 1.  Am. Compl. ¶ 74. United Rentals states that "Defendant Laborers benefit by expanding [their] jurisdiction into an industry where [they have] historically not participated, at least in Indiana," and that "Defendant ICI and the ICI Contractors benefit . . . by, among other things, restricting or eliminating competition and reducing the number of companies performing [highway traffic control] work."  Id.  Further, United Rentals claims that Defendants' "illegal conspiracy" was formed in order to fix the price of highway traffic control work in Indiana, and "ha[s] caused an injury to competition in the market," and that it is being given the "Hobson's choice of either attempting to abrogate its lawful agreement with CLA or to cease doing business within the State of Indiana."  Id. ¶¶ 76, 78, 79.

13

United Rentals alleges as Count Two that Defendants' activities constitute "an unlawful scheme, contract, combination and conspiracy that unreasonably restrains trade and commerce, in violation of . . . Indiana Code § 24-1-2-1." The arguments in support of this allegation are substantially similar to those advanced in support of Count One.

As its Count Three, United Rentals submits that "Defendants engaged in an unlawful scheme, contract, or combination to restrain or restrict bidding for the letting of any contract for highway traffic control work within the State of Indiana, in violation of Indiana Code § 24-1-2-3." Id. ¶ 90. The arguments in support of this allegation are also substantially similar to those advanced in support of Count One.

United Rentals's Count Four is alleged against Defendant Laborers only. It asserts that based on the 2004 subcontracting clause, the MOU, Mr. Kahl's memorandum, and Mr. Terry's statement to United Rentals, "Defendant Laborers has threatened, coerced and restrained Plaintiff United Rentals, in violation of Section 8(b)(4)(ii)(A), (B), and (C) of the NLRA, 29 U.S.C. § 158(b)(4)(ii)(A), (B), and (C)," which define certain unfair labor practices under the NLRA. Id. ¶ 96. Section 303 of the Labor Management Relations Act, 29 U.S.C. § 187(a) makes it unlawful for a labor organization to engage in such unfair labor practices. United Rentals maintains that the object of the Laborers' actions was to:

> (a) force or require Plaintiff United Rentals to enter into an agreement which is prohibited by Section 8(e) of the NLRA, 29 U.S.C. § 158(e); (b) force or require certain ICI Contractors to cease doing business with Plaintiff United Rentals and to force or require Plaintiff United Rentals to recognize or bargain with locals of Defendant Laborers, where such local labor organizations have

14

not been certified as the representative of employees of Plaintiff United Rentals under Section 9 of the NLRA; and (c) force or require Plaintiff United Rentals to recognize and bargain and sign a labor agreement with local unions of Defendant Laborers, when Plaintiff United Rentals has an ongoing collective bargaining relationship with CLA, which was certified as the representative pursuant to Section 9 of the NLRA.[13]

United Rentals's Count Five against both ICI and the Laborers alleges tortious interference with prospective economic advantage. United Rentals claims that it has business relationships with the United States government, the State of Indiana, and local jurisdictions within Indiana, that Defendants were aware of these relationships, and that Defendants intentionally and unjustifiably interfered with them. Id. ¶¶ 99-105.

Based on the above five allegations, United Rentals filed its Complaint in this lawsuit on April 20, 2005, and later resubmitted as an Amended Complaint on June 9, 2005. In its complaint, United Rentals seeks injunctive relief and damages to remedy its alleged injuries. Am. Compl. at 28-30. Defendant Laborers' Motion for Summary Judgment, filed on February 27, 2006, applies to all five counts of United Rentals's Amended Complaint. ICI's joinder to Laborers' Motion for Summary Judgment, filed on February 28, 2006, applies to Counts One, Two, Three, and Five (as ICI is not named a defendant with respect to Count Four). Plaintiff's Motion for Partial Summary Judgment, filed on April 6, 2006, opposes Defendants' Motion for Summary Judgment in its entirety, and seeks partial summary judgment in its own favor based on the fact that "the nonstatutory labor exemption to the federal antitrust laws does not apply to Defendants'

---

[13] Id.

conduct."  Pl.'s Am. Mem. at 1.

Legal Analysis

**A.      Summary Judgment Standard of Review**

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  See id. at 255. However, neither the "mere existence of some alleged factual dispute between the parties," Id., 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.  Michas v. Health Cost Controls of Illinois, Inc., 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence

16

to support the non-moving party's case.  Id. at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes.  Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994).  Thus, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate.  See Shields Enter., Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989).  But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish her case, summary judgment is not only appropriate, but mandated.  See Celotex, 477 U.S. at 322; Ziliak v. AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003).   Further, a failure to prove one essential element "necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 323.

Courts are often confronted with cross-motions for summary judgment because Rules 56(a) and (b) of the Federal Rules of Civil Procedure allow both plaintiffs and defendants to move for such relief.  "In such situations, courts must consider each party's motion individually to determine if that party has satisfied the summary judgment standard."  Kohl v. Ass'n. of Trial Lawyers of Am., 183 F.R.D. 475 (D.Md.1998). Thus, in determining whether genuine and material factual disputes exist in this case, the Court has considered the parties' respective memoranda and the exhibits attached thereto, and has construed all facts and drawn all reasonable inferences therefrom in the light most favorable to the respective non-movant.  Matsushita Elec. Indus. Co. v. Zenith Radio

17

Corp., 475 U.S. 574 (1986).


**B.     Legality of the Subcontracting Clause under NLRA Section 8(e)**

Of primary importance in this case is whether the subcontracting clause is facially

legal under NLRA Section 8(e).  The Laborers contend that United Rentals's "entire case

is built on this contention, because United Rentals must demonstrate that these provisions

are not protected by the national labor laws before they can be subjected to antitrust

review."  Laborers' Mem. at 13.  United Rentals's statutory claims, addressed specifically

below, each depend (at least in part) on the legality of the labor practice at issue.  Thus,

the legality of the subcontracting clause under Section 8(e) is a sensible place to begin our

analysis.

Section 8(e) of the NLRA, found at 29 U.S.C. § 158(e), states in pertinent part:

> It shall be an unfair labor practice for any labor organization and any employer
> to enter into any contract or agreement, express or implied, whereby such
> employer ceases or refrains or agrees to cease or refrain from handling, using,
> selling, transporting or otherwise dealing in any of the products of any other
> employer, or to cease doing business with any other person, and any contract
> or agreement entered into heretofore or hereafter containing such an agreement
> shall be to such extent unenforcible [*sic*] and void[.][14]

However, Section 8(e) further provides an exception to this rule, commonly known as the

"construction industry proviso."[15]  It provides:

---

[14] 29 U.S.C. § 158(e).

[15] The Supreme Court has given significant weight to the legislative history of the
(continued...)

18

[N]othing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work[.][16]

The Laborers assert that the subcontracting clause and the MOU are lawful under Section 8(e) because the construction industry proviso, reproduced above, permits agreements like those at issue here.[17]  Laborers' Mem. at 15.  They rely heavily upon

---

[15](...continued)
construction industry proviso, passed in 1959, in interpreting the clause.  In Woelke & Romero Framing v. NLRB, 456 U.S. 645, 657 (1982), the Court stated that "statements [contained in the legislative record] reveal that Congress wished to preserve the *status quo* regarding agreements between unions and contractors in the construction industry. . . . To the extent that subcontracting agreements were part of the pattern of collective bargaining in the collective bargaining in the construction industry, and lawful, Congress wanted to ensure that they remained lawful.  Given this expression of legislative intent, we can determine whether [subcontracting clauses] are within the scope of the proviso . . . by examining Congress' perceptions regarding the status quo in the construction industry."

Though the Seventh Circuit has noted that it "cannot find in the legislative record any clearly articulated reason for the inclusion of the construction industry proviso," it notes that "numerous courts and commentators have concluded . . . that [it] exists because of an underlying congressional concern with minimizing jobsite tension" and that "[t]he Supreme Court has recently observed that the construction industry proviso was also included in order to accommodate conditions specific to the construction industry such as the short-term nature of construction employment."  Milwaukee and Southeast Wisconsin Dist. Council of Carpenters v. Rowley-Schlimgen, Inc., 2 F.3d 765, 767 (7th Cir. 1993) (internal citations omitted).

[16] 29 U.S.C. § 158(e).

[17] In addition, the Laborers contend in the alternative that the subcontracting clause is a "work preservation" clause, aimed to preserve for the Laborers work they had historically performed.  Laborers' Mem. at 15.  Clauses with this primary purpose are not prohibited by Section 8(e).  See, e.g., Local 282, Teamsters, 197 NLRB 673 (1972).  United Rentals contests this assertion on two grounds: first, that traffic control work has not historically been performed by the Laborers, and second, that the objective of the subcontracting clause has only a secondary objective of work preservation.  Pl.'s Am. Mem. at 2, 21-24.  Because we hold herein that the subcontracting clause is lawful under Section 8(e) by virtue of the construction industry proviso, we do not address this alternative argument.

Woelke & Romero Framing v. NLRB, 456 U.S. 645 (1982), in which the Supreme Court upheld the legality of two subcontracting clauses which (similarly to the clause at issue here) prohibited construction employers from subcontracting work to subcontractors who were not signatory to an agreement with a particular labor union.  As discussed in footnote 15, *supra*, the Court in Woelke placed heavy emphasis on Congressional intent in determining that the construction industry proviso was meant to preserve the 1959 *status quo* with respect to collective bargaining within that industry, which included subcontracting clauses applicable to on-site construction work.

### 1.      *Applicability to the Traffic Control Industry*

United Rentals argues that traffic control is not a part of the construction industry, and that its employees do not perform construction work.  Pl.'s Am. Mem. at 5.  Its employees do not typically install permanent fixtures to the roadway; generally, "United Rentals does not bid on any work that remains affixed to the road once the project is completed."  Id. at 6.  Its employees are not regularly at the construction site, and if they are, it is usually before or after construction employees are there – when United Rentals employees are setting up or taking down traffic control devices to create a safe work area for construction workers. United Rentals maintains that its employees have "only rare and incidental contact" with construction workers on-site.  Id. at 7.  Its employees spend "[t]he vast majority of their work time . . . loading and unloading equipment at United Rentals's two locations and driving from site to site to deliver traffic control devices or in

pre-construction set up before any actual construction begins." Id. at 8.

In addition, United Rentals emphasizes that the construction industry proviso is intended to reflect the 1959 status quo in the construction industry – which does not encompass the traffic control industry.  This argument hinges on United Rentals's assertion that there *was* no traffic control industry in 1959 – indeed, the modern industry did not exist until the late 1970s or early 1980s. Id. at 31.  Therefore, Congress could not have meant to preserve such a status quo.  Cf. In re South Jersey Reg'l Council of Carpenters, Local 623, 335 NLRB 586, 594 (2001) ("The Board has warned against an expansive reading of the construction industry proviso. . . . There is no proof in this record that Congress in 1959 had any inkling that the trade show industry existed[.]").

United Rentals also argues that the Congressional purpose of the proviso – minimizing jobsite friction – is not served by the subcontracting clause.  Traffic control workers have at most incidental contact with construction workers, as well as different interests and working conditions.  Thus, tensions created when "union and non-union laborers . . . are required to work together for more than brief periods of time" are not at issue here.  See Acco Constr. Equip. v. NLRB, 511 F.2d 848, 851 n.8 (9th Cir. 1975).

The Laborers counter that United Rentals's assertions are simply untrue, based on the testimony of ICI Contractors that their union employees and United Rentals's employees are "frequently" on the jobsite at the same time, and do share common interests and working conditions.  Laborers' Reply/Response at 11-13, citing Lucas dep. 102-03, Stebbins dep. 80.  Further, they maintain that United Rentals's claims in this

21

regard are contrary to Woelke, in which the Supreme Court held that jobsite friction was not the only purpose of the subcontracting industry proviso, and that there is no requirement that union and nonunion workers be working together on a site in order for the proviso to be in force.  Laborers' Reply/Response at 11-12, citing Woelke, 456 U.S. at 661-62.

The Laborers also dispute United Rentals's assertion that the traffic control industry was not within Congress's contemplation at the time the proviso was written; rather, "traffic control functions have been part of road and highway construction work . . . dating back to at least the 1950s."  Laborers' Reply/Response at 17.  It notes that there was a broad practice of union signatory contract clauses in the construction industry in 1959, as discussed in the legislative history cited by the Court in Woelke.  Id. at 14-15.  Further, it views traffic control as "an integral part of the entire road construction project" and not as a separate industry, stating that "these subcontractors are no different than the other myriad subcontractors who have sprung up in the highway construction business over the years to perform certain portions of the overall project."  Id. at 15.  If we accepted United Rentals's argument, "any changes in construction industry practices since 1959 . . . would result in portions of the industry becoming exempt from the effect of job site subcontracting clauses over time. . . . [This] would effectively destroy any protection afforded by [the proviso]."  Id. at 16.  Further, the Laborers argue, the relevant question is not whether subcontractors like United Rentals are a part of the construction industry as that would have been interpreted in 1959, but whether *ICI Contractors* is a

22

construction industry employer, which it undoubtedly is.  Id. at 15-16.

In our view, the clear holding of Woelke trumps United Rentals's arguments regarding the length of time spent by its employees on the jobsite, and the frequency of contact between union and nonunion employees.  Woelke holds in the clearest of terms that the proviso is not effective only where jobsite friction is evident.  See 456 U.S. at 666 ("the construction industry proviso . . . shelters union signatory subcontracting clauses that are sought or negotiated in the context of a collective-bargaining relationship, *even when not limited in application to particular jobsites at which both union and nonunion workers are employed*") (emphasis added).  We note, as correctly pointed out by the Laborers and ICI, that the plain language of the proviso does not require that *United Rentals* itself be a member of the construction industry.  The proviso applies to "an agreement between a labor organization [here, the Laborers] and an employer in the construction industry [here, ICI Contractors] relating to the contracting or subcontracting of work to be done at the site of the construction."  By its terms, the proviso does *not* require that the *subcontractor*, United Rentals, be "an employer in the construction industry."  United Rentals does not contest that ICI Contractors is an employer within the construction industry.  Therefore, United Rentals's assertions that it does not perform construction work may well be true, but are largely immaterial in this context.

We recognize United Rentals's concerns with the legislative history and context of the construction industry proviso, which the Woelke Court overtly acknowledges are key

23

in its interpretation.  However, we do not agree with United Rentals's assertion that, because the traffic control industry may not have existed in precisely its present form in 1959, the proviso is inapplicable here.  The parties disagree about the timing of the evolution of the modern traffic control industry, and we recognize that this presents a genuine dispute.  However, regardless of whether the industry existed in its modern form at the time section 8(e) was passed, it is clear from Woelke and the text of the proviso that it was encompassed by the referenced Congressional intent respecting construction industry subcontracting agreements such as that presented here.  Thus, in our view, we need not inquire into the historical specifics of the traffic control industry in 1959. Though the intention of Congress in enacting the proviso was to "preserve the *status quo* regarding agreements between unions and contractors in the construction industry,"[18] the Supreme Court has characterized those agreements as "quite common" and "broad" at the time of the proviso's enactment.  Id. at 657.  We agree with the Laborers that changes in specific construction industry practice over the years cannot workably imply the total exclusion of that industry from the protection of the proviso.  Further, as explained above, the applicability of the proviso really turns on the *construction* industry (the industry of the *employer*), not the traffic control industry (the industry of the *subcontractor*).[19]  Thus,

---

[18] Woelke, 456 U.S. at 657 (internal citation omitted).

[19] Cf. In re South Jersey Regional Council of Carpenters, Local 623, 335 NLRB 586 (2001), relied upon by United Rentals.  In that case, the NLRB ruled on the inapplicability of the proviso to the trade show industry – the industry in which the *employer*, not just the subcontractor, was engaged.

24

Congress's foresight (or lack thereof) regarding the particulars of the modern traffic control industry does not, as United Rentals would have it, control here.  The parties do not dispute that highway construction such as that performed by the ICI Contractors falls squarely within the proviso, and thus we hold it is applicable to the subcontracting clause at issue.

### 2.     On-Site vs. Off-site Work

The Laborers contend that the subcontracting clause and the MOU are, by their terms, expressly limited to *on-site* work.  Laborers' Mem. at 17.  The Laborers state that the subcontracting language is "in all material respects identical to" the subcontracting clause upheld by the Supreme Court in Woelke, which tracks exactly the language of the construction industry proviso.[20]  Laborers' Reply/Response at 9.  They reiterate that ICI Contractors are not required by the Agreement to utilize signatory subcontractors for work that is *not* performed at the job site, including supply and delivery of traffic control devices.  Laborers' Mem. at 8, 9, 18.  However, those elements of traffic control work which must be performed on-site – like setting up barricades and signs, and affixing and removing pavement markings – must be performed by signatory subcontractors under the clause.  Id. at 18-19.  The Laborers assert that United Rentals's work is predominantly on-

---

[20] The Woelke clause provided that employers could not contract work "to be done at the site of the construction, alteration, painting or repair of a building, structure, or other work" to a nonsignatory entity.  Id. at 9.

site work.[21]  Id. at 20.  Even if there is ambiguity, the Laborers assert, it is removed by the MOU, which applies specifically to on-site work.  Id. at 23.

United Rentals contends that, by its terms, the subcontracting clause is *not* limited to on-site work, as is required by the construction industry proviso.  Again, the proviso applies to "agreement[s] . . . relating to the contracting or subcontracting of work to be done *at the site* of the construction, alteration, painting, or repair of a building, structure, or other work."  29 U.S.C. § 158(e).  The subcontracting clause at issue here states that an employer may not contract "any work covered by this Agreement to be done at the site of construction, alterations, repairs or any new construction *or any other work* to any [non-signatory entity]."  Pls.' Am. Mem. at 37 (emphasis added).  United Rentals contends that the "or any other work" language encompasses off-site work; or, at least, it makes the clause sufficiently ambiguous as to require that we consider extrinsic evidence to determine how the clause should be interpreted.  See Sheet Metal Workers Local Union No. 91, 305 NLRB 1055 n.5 (1991).  United Rentals also cites examples of three different ICI Contractors refusing to accept its bids for jobs that involved equipment rental, *not* on-site work, as a result of the subcontracting clause.[22]  United Rentals concludes that

---

[21] As evidence for this assertion, the Laborers cite the fact that United Rentals spends approximately 35% of its monthly labor costs on "Davis-Bacon" wages – a wage requirement applicable only to on-site work.  Id. at 20.

[22] The Laborers respond that they have no authority to control individual ICI Contractors' methods of soliciting bids from or distributing work to subcontractors.  Laborers' Reply/Response at 23-25.  ICI also asserts that it is not legally responsible for the unilateral actions of individual contractors.  ICI's Reply at 6-8.

Defendants "had no intention of enforcing the subcontracting restriction within a so-called 'on-site' limitation."  Id. at 42.

>        a.      United Rentals's On-Site Work

Two disputes have come to the fore here.  The first is whether United Rentals's work that physically occurs at the jobsite (primarily delivery, setup, and removal of traffic control devices and pavement markings) qualifies as work "done at the site of . . . construction," and thus comes within the ambit of the proviso.  The NLRB's treatment of what constitutes "on-site" work has been fairly nuanced.[23]  In Int'l Union of Operating Eng'rs, Local 12 (Steif Co. West), 314 NLRB 874 (1994), the NLRB found that a contractor that delivered steel molds to a jobsite and poured concrete into the molds at the site to create concrete barriers *was* doing on-site work, because "the steel forms [were] more akin to tools and equipment used continuously by employees at the site than to materials, products, or supplies that are simply delivered by a driver whose contact with workers at the site is incidental to that delivery."  Id. at 877.

In contrast, the NLRB has repeatedly found that the construction industry proviso "does not apply to various types of transportation work."  See id., Joint Council of Teamsters No. 42 (AGC of California), 248 NLRB 808 (1980) (citing a House Conference report stating that the construction industry proviso "does not exempt from

---

[23] We note that "the Board's interpretation of the Act and the Board's application of it in doubtful situations are entitled to weight."  NLRB v. Denver Bldg. & Constr. Trades Council, 341 U.S. 675, 692 (1951).

Section 8(e) agreements relating to supplies and materials or other products shipped or otherwise transported to, and delivered, on the site of construction"). In this vein, "the Board has found that the mixing, delivery, and pouring of ready-mix concrete,[24] the delivery of precast concrete pipe, the transportation of tools, materials, and personnel to and from a construction site, the delivery of sand fill, and the haulage of waste are not jobsite work." Steif, 314 NLRB at 877 (internal citations omitted).

In our view, the traffic control work done by United Rentals is more akin to the work performed in Steif than that at issue in Island Dock Lumber and the other delivery cases. While United Rentals does deliver traffic control equipment from its offices to the site, it does not merely transport or "dump" the materials when it reaches the site. The specific placement of the traffic control devices is, in fact, the essence of the traffic control function. Cones, barricades, and lane markers must be specifically placed at the jobsite – not simply delivered – in order to ensure the safety of the construction crews and the public and provide for efficient traffic flow. Special tools (like the steel forms in Steif) are required for the installation of pavement markings and stripes, which again must be affixed at precise points around the construction site.

---

[24] This example refers to Teamsters Local 294 (Island Dock Lumber), 145 NLRB 484 (1963), enf'd, 351 F.2d 547 (D.C. Cir. 1966). In that case, the Board relied on the fact that "[t]he pouring of the concrete is the essence of and constitutes the actual delivery because liquid concrete, by its very nature, cannot be dumped on the ground at the construction site like other materials. While the liquid concrete is still in the agitator truck, it has not been delivered until the actual delivery by pouring." Id. at 491. In addition, the concrete mixing work was not "on-site" because "[t]hough the mixing may have taken place on the site, it could equally have taken place off site, the location of the mixing act being highly immaterial to the mixing operation itself."

Unlike the ready-mix concrete pouring in Island Dock Lumber, the traffic control work done at the jobsite does not "constitute[] the actual act of delivery."  145 NLRB at 491.  Traffic control devices do not impose such logistical problems as the concrete did in that case, wherein the work "could equally have taken place off site" but did not, due to a physical characteristic that made it more sensible to do it on-site.  The NLRB's analysis in Island Dock Lumber is simply inapposite here.  Unlike that situation, "delivery" of traffic control devices *without* particular setup would be possible, in our estimation – a company could simply leave the materials in a pile by the side of the road.  However, by all accounts, this is not the service primarily provided by United Rentals.  The work that it does is site-specific and constitutes much more than the isolated act of delivery.  Therefore, we conclude that United Rentals's work *is* on-site work, and is encompassed in the scope of the construction industry proviso.

     *b.*     *The Language of the Subcontracting Clause*

The other dispute that has arisen in this context is whether the subcontracting clause, by its terms, encompasses off-site work.  The Laborers and ICI maintain that the clause's language is essentially identical to the language of the construction industry proviso.  United Rentals claims that the clause's coverage exceeds the proviso's scope.  Our reading of the clause and the proviso, side by side, indicates that there *is* an important difference in meaning that arises.  Compare the construction industry proviso, which covers

29

> work to be done at the site of the construction, alteration, painting, or repair
> of a building, structure*, or other work*

with the subcontracting clause, which applies to

> work . . . to be done at the site of construction, alterations, repairs or any
> new construction *or any other work*[.]

Though these two provisions appear similar, different meanings can be imputed to

them, thanks to the dubious grammar of the subcontracting clause.  In the proviso, it is

clear that the phrase "or other work" is to be read in a series with "building, structure,".

This is in line with well-established grammatical rules regarding the serial comma.[25]

Thus, the work referred to would occur at the site of (1) the construction, alteration,

painting, or repair of a building; (2) the construction, alteration, painting, or repair of a

structure; or (3) the construction, alteration, painting, or repair of some *other work*.

Clearly, in this context, "work" is intended to refer to a physical structure.  See  The

American Heritage Dictionary of the English Language 1474, "work" defn. 5b (1976)

(defining "works" as "[e]ngineering structures, such as bridges or dams").

However, in the subcontracting clause, the meaning of "other work" is ambiguous.

As we understand it, the Laborers would have us interpret the word "work" to mean, as

above, a physical structure – such that all of the items following "at the site of," and

_____

[25] See William Strunk, Jr. and E.B. White, The Elements of Style 2 (3rd ed. 1979) ("In a
series of three or more terms with a single conjunction, use a comma after each term except the
last.").

connected either by commas or the word "or," are to be read in a series.[26]  Thus, the clause would apply to work to be done at the site of construction, at the site of alterations, at the site of repairs, at the site of new construction, or at the site of any other work. Alternatively, United Rentals prefers a reading that delineates two subsets of work within the clause: both "work . . . to be done at the site of construction, alterations, repairs or any new construction," and, *separately*, "any other work."  Under this reading, "work" of the second type refers not to a physical structure, but to "employment [or] a job."[27]  Under this reading, off-site work would be encompassed under this second umbrella of "any other work," and the clause would be outside the parameters of the construction industry proviso.

This grammatical nitpicking is not merely pedantic – indeed, it is key to rendering a proper interpretation of the agreement.  In our view, the poor articulation of the subcontracting clause creates sufficient ambiguity as to require that we consider extrinsic evidence in order to determine how it was meant to be administered.  See Ets-Hokin Corp., 154 NLRB 839, 841 (1965) ("If a clause is ambiguous, the Board in a Section 8(e)

---

[26] To our ear, this is not the most natural reading of the clause.  For one, the series would be connected inconsistently by commas and sometimes the word "or," in violation of the serial comma rule discussed above.  Secondly, the series would encompass, separately, both work to be done at the site of construction and work to be done at the site of *new* construction.  This reading seems to render some of the words of the clause superfluous.  Compare the canons of *statutory* construction discussed by the Supreme Court in Duncan v. Walker, 533 U.S. 167, 174 (2001) ("It is our duty to give effect, if possible, to every clause and word of a statute. . . . [A] statute ought . . . to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (internal citations omitted).

[27] See  The American Heritage Dictionary of the English Language 1474, "work" defn. 2 (1976).

31

proceeding will not presume unlawfulness, but will consider extrinsic evidence to determine whether the clause was intended to be administered in a lawful or unlawful manner.").

The consideration of extrinsic evidence leads us to conclude that, given all reasonable inferences to be drawn from the material facts, taken in the light most favorable to the non-movant, the Laborers and ICI intended for the subcontracting clause to be administered in compliance with the construction industry proviso: that is, in application only to on-site work. The Memorandum of Understanding and the Kahl Memorandum guide our reasoning here. The MOU between the Laborers and ICI clearly and unambiguously states that the subcontracting clause is "to be applied to site work only." Am. Compl. Ex. C. It goes on to refer to "site work," "traffic control site work," "[d]riving of assigned vehicles on site," and "site maintenance." Id. Further, the Kahl Memorandum, issued to all ICI Contractors, refers repeatedly to "site work" and once to "construction site traffic control work." Am. Compl. Ex. D. These internal documents and their repeated references to on-site work, as well as the overt statement in the MOU restricting application to on-site work, clarify the intentions of these parties.

United Rentals asserts that three different ICI contractors have, *individually*, denied them opportunities for off-site equipment-rental work, imputing this to the Defendants here as evidence of unlawful intent. We cannot give weight to this assertion. The fact that individual contractors may have misinterpreted the agreement (if, in fact, this is the case) is not sufficient evidence to warrant attributing such a motivation to ICI

32

and the Laborers.  The Laborers and ICI rightly point out that they are not responsible for

the employment decisions of individual contractors.  Particularly in light of the

unambiguous language in the MOU and the Kahl Memorandum, we cannot say that these

instances create a genuine dispute of material fact regarding the intended administration

of the subcontracting clause.[28]

_____

[28] In addition to the above arguments, United Rentals argues that it would be legally prohibited from signing an agreement with Laborers.  In addition to its preexisting relationship with CLA, discussed <u>supra</u>, it states that the signatory clause "contemplates the execution of an 8(f) pre-hire agreement" with the Laborers.  Pls.' Am. Mem. at 32.  Because an employer cannot enter into an 8(f) agreement unless it is "an employer . . . engaged primarily in the building and construction industry" (<u>id.</u> at 33 (internal quotation omitted)), and United Rentals is not so engaged, it would be illegal for it to enter into such an agreement.  Rather, it must enter into more lasting 9(a) bargaining relationships.  United Rentals argues that subcontracting provisions affecting employers with 9(a) bargaining relationships, rather than 8(f) relationships, "should presumptively be treated as beyond the protection of the Section 8(e) proviso."  <u>Id.</u> at 37.

The Laborers dispute these assertions, and argue that there is no authority, either in caselaw or in the legislative history of section 8(e), to support such a construction of the proviso. Laborers' Reply/Response at 18.  Also, they cite testimony within the House Labor Committee, discussed in <u>Woelke</u>, which contemplates such a situation as that in which United Rentals currently finds itself.  The Court stated that "[s]ignificantly, despite this testimony, Congress decided to exclude the construction industry from the scope of § 8(e)."  <u>Id.</u> at 19, citing <u>Woelke</u>, 456 U.S. at 658 n.10.  Therefore, the Laborers argue that Congress consciously accepted the consequences of the application of union signatory subcontracting clauses in the construction industry, "including the possibility that particular employers . . . might find themselves unable to compete for work."  Laborers' Reply/Response at 19.

We agree with the Laborers' analysis.  The <u>Woelke</u> Court indeed concluded that "Congress endorsed subcontracting agreements obtained in the context of a collective-bargaining relationship – and decided to accept whatever top-down pressure such clauses might entail."  456 U.S. at 663.  The legislative history of Section 8(e) contained in <u>Woelke</u> makes specific reference to situations in which "other-union" subcontractors could be harmed by the proviso. <u>Id.</u> at 658.  Moreover, the Ninth Circuit has addressed the difficulties encountered by subcontractors like United Rentals who are signatory to other unions, and concluded that "[d]espite [Congress's] awareness that [subcontracting] clauses could be used to exclude subcontractors represented by other unions, as well as non-union employers, it enacted the proviso. . . .  We must give effect to Congress' intent[.] . . . Whether the section 8(e) proviso applies to union specific subcontracting clauses has been resolved by <u>Woelke</u> and we do not have the power to reexamine that question[.]" <u>Sun-Land Nurseries, Inc. v. Southern California</u>

(continued...)

Therefore, for the reasons explicated above, we hold that the construction industry proviso to Section 8(e) of the NLRA permits such agreements as the subcontracting clause between ICI Contractors and the Laborers.

## C.    United Rentals's Federal Antitrust Claim and the Nonstatutory Exemption

United Rentals's federal antitrust claim (Count One) is based on Section 1 of the Sherman Act, 15 U.S.C. § 1.  Am. Compl. ¶ 74.  That statute provides, in relevant part, that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  United Rentals alleges that the Laborers and ICI have restrained trade by restricting competition for highway traffic control work through the activities herein described.  Id. ¶¶ 75-79.

The Supreme Court has recognized that "a proper accommodation between the congressional policy favoring collective bargaining under the NLRA and the congressional policy favoring free competition in business markets requires that some union-employer agreements be accorded a limited nonstatutory exemption from antitrust sanctions."  Connell Constr. Co. v. Plumbers and Steamfitters Local Union No. 100, 421 U.S. 616, 622 (1975).  This exemption from antitrust laws (such as the Sherman Act) is

---

[28](...continued)
Dist. Council of Laborers, 793 F.2d 1110, 1114 (1986), cert. denied, 479 U.S. 1090 (1987). Thus, we must conclude that such effects were within Congress's contemplation, and will not read into Section 8(e) the novel interpretation preferred by United Rentals.

necessary in order to "give effect to federal labor laws and to allow meaningful collective bargaining to take place." Brown v. Pro Football, Inc., 518 U.S. 231, 237 (1996).

In Suburban Tile Ctr., Inc. v. Rockford Bldg. and Constr. Trades Council, 354 F.2d 1 (7th Cir. 1965), cert. denied, 384 U.S. 960 (1966), the Seventh Circuit held that a subcontracting clause that was covered by the construction industry proviso to Section 8(e) was exempt from antitrust scrutiny, stating that "[a] construction subcontracting agreement has been held to be a mandatory subject of collective bargaining. . . . Economic action to secure such agreements has been allowed. . . . In the face of these decisions, it would be unreasonable to hold that success in securing such an agreement constitutes a violation of the anti-trust laws." Id. at 3. In Sun-Land, the Ninth Circuit similarly held that, though such clauses would not be "wholly exempt from scrutiny if they are shown to be instruments of an antitrust conspiracy otherwise existing . . . a valid subcontracting clause contained in a collective bargaining agreement cannot serve as the basis of an antitrust claim. . . . Congress would not have exempted the construction industry from the prohibition against 'hot cargo' clauses only to have such provisions create liability under the antitrust laws." 793 F.2d at 1117. The Supreme Court, in Local Union No. 189 v. Jewel Tea, 381 U.S. 676, 690 (1965), held that an agreement which was obtained through "bona fide, arm's length bargaining" was exempt from the Sherman Act. The Laborers argue that the subcontracting clause here, lawful under Section 8(e), is entitled to this non-statutory exemption because it, too, is the produce of arms-length collective bargaining between the Laborers and ICI-LRD. Laborers' Mem. at 27.

35

United Rentals contends that the subcontracting clause here is akin to the agreement in Connell, to which the Supreme Court declined to apply the nonstatutory exemption.  The agreement in that case was outside of a collective-bargaining relationship and involved a contractors' association receiving "most favored nation" status by a labor union, such that the union agreed not to grant any more favorable contract to any other employer without extending the same terms to all members of the contractors' association.  Id. at 619.  When one contractor refused to sign the agreement, the union picketed that contractor's construction sites.  The contractor claimed that the agreement violated the Sherman Act.  The Court held that the agreement "may be the basis of a federal antitrust suit because it has a potential for restraining competition in the business market in ways that would not follow naturally from elimination of competition over wages and working conditions."  Id. at 635.  The Court characterized the agreement as "coercive" and "a campaign to exclude nonunion firms."  Id. at 626.

United Rentals argues that the subcontracting clause "cannot be defended on the basis of the federal policy in favor of collective bargaining because merely 'entering into' an unlawful union signatory clause is unlawful."  Pl.'s Am. Mem. at 43.  However, as we have explained, the subcontracting clause is within the bounds of the construction industry proviso of Section 8(e), and is therefore lawful under the NLRA.  Also, unlike Connell, the clause at issue here occurs within the context of a collective-bargaining relationship between the Laborers and ICI.  The Connell Court held that the protection of the construction industry proviso "extends only to agreements in the context of collective-

36

bargaining relationships." 421 U.S. at 633. Such a relationship exists here. Therefore, this case is easily distinguishable from Connell, and does not pose the same "potential for restraining competition" posed by that agreement. Any anticompetitive effect which arises here is mitigated by the policy in favor of collective bargaining, and the agreement here is thus entitled to the nonstatutory exemption from federal antitrust scrutiny. Accordingly, Plaintiff's Motion for Partial Summary Judgment is hereby DENIED, and Defendants' Motion for Summary Judgment is GRANTED as to Count One.

**D.     United Rentals's State Antitrust Claims and State Law Preemption**

Counts Two and Three brought by United Rentals are brought pursuant to Indiana antitrust law.[29] The Laborers argue that state antitrust claims based upon conduct alleged to violate Section 8(e) of the NLRA are preempted by federal labor law, based on Connell. Laborers' Mem. at 32-33. Such preemption would be in line with the doctrine of San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236 (1959), which preempts state law that regulates conduct arguably within the scope of NLRA Sections 7 and 8.

------

[29] Count Two is brought pursuant to Indiana Code § 24-1-2-1, which states, in pertinent part: "[e]very scheme, contract, or combination in restraint of trade or commerce, or to create or carry out restrictions in trade or commerce, or to deny or refuse to any person participation, on equal terms with others, . . . within or without this state, is illegal[.]"

Count Three is brought pursuant to Indiana Code § 24-1-2-3, which states: "[a] person who engages in any scheme, contract, or combination to restrain or restrict bidding for the letting of any contract for private or public work, or restricts free competition for the letting of any contract for private or public work, commits a Class A misdemeanor."

The basis of such preemption is that allowing "state antitrust law to regulate union activities in aid of organization . . . creates a substantial risk of conflict with policies central to federal labor law." Connell, 421 U.S. at 635-36.

United Rentals contends that "there is nothing in Connell suggesting that the Court meant to apply Garmon wholesale to antitrust cases, or 8(e) proviso cases in particular" and that "Connell did not cite Garmon preemption." Pl.'s Am. Mem. at 44. Rather, United Rentals argues that we should determine whether state antitrust laws are preempted "on a case-by-case basis based on the specific claims." Id.

United Rentals's contention is blatantly erroneous. Connell provides, clearly and unambiguously, that "federal law pre-empts state remedies that interfere with federal labor policy or with specific provisions of the NLRA," and that state anti-trust law "must . . . be pre-empted" to avoid the risk of conflicting policies.[30] 421 U.S. at 635-36. Contrary to United Rentals's statement, Connell specifically cites Garmon in support of this assertion. See id. at n.17.

Furthermore, United Rentals's proposed case-by-case alternative approach (for which it cites no precedent) is specifically addressed – and rejected – in Connell:

> In this area, the accommodation between federal labor and antitrust policy is delicate. Congress and this Court have carefully tailored the antitrust statutes to avoid conflict with the labor policy favoring lawful employee organization

---

[30] It should be noted that some narrow exceptions to this general Garmon preemption rule do exist – for example, when state regulations are directed at interests "deeply rooted in local feeling and responsibility." Garmon, 359 U.S. at 244. However, there has been no argument that such exceptions are applicable here. Thus, we will proceed under the general Garmon/Connell preemption rule.

. . . State antitrust laws generally have not been subjected to this process of accommodation.  If they take account of labor goals at all, they may represent a totally different balance between labor and antitrust policies.  Permitting state antitrust law to operate in this field could frustrate the basic federal policies favoring employee organization and allowing elimination of competition among wage earners, and interfere with the detailed system Congress has created for regulating organizational techniques.[31]

Therefore, in accordance with the clear holding by the Supreme Court in <u>Connell</u>, we conclude that United Rentals's Indiana antitrust claims are preempted by federal labor law.  <u>See also</u> <u>Gould v. Wisconsin Dep't of Indus., Labor and Human Relations</u>, 750 F.2d 608 (7th Cir. 1984).  Therefore, Defendants' Motion for Summary Judgment is GRANTED as to Counts Two and Three.

## E.    United Rentals's LMRA Claim Against the Laborers

Count Four of United Rentals's Complaint, alleged only against the Laborers, claims that the Laborers violated Section 303 of the Labor Management Relations Act, 29 U.S.C. §187(a).  Section 303 makes it unlawful for a labor organization, in an industry or activity affecting commerce, to engage in unfair labor practices as defined in Section 8(b)(4) of the NLRA, 29 U.S.C. §158(b)(4).  United Rentals claims that the Laborers violated NLRA Section 8(b)(4)(ii)(A), (B), and (C).  Pl.'s Am. Compl. ¶ 96.

Section 8(b)(4)(ii)(A), (B), and (C) provide that:

It shall be an unfair labor practice for a labor organization or its agents –
. . .
(ii) to threaten, coerce, or restrain any person engaged in commerce or in an

---

[31] <u>Id.</u> at 636.

industry affecting commerce, where in either case an object thereof is –

(A) forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by subsection (e) of this section;

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: Provided, That nothing in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

(C) forcing or requiring any employer to recognize or bargain with a particular labor organization as the representative of his employees if another labor organization has been certified as the representative of such employees under the provisions of section 159 of this title[.][32]

United Rentals argues that the Laborers engaged in unlawful, coercive actions via the subcontracting clause, the MOU, the Kahl memorandum, and Mr. Terry's statement to United Rentals.  Pl.'s Am. Compl. ¶ 96.  In addition, since the date of the Complaint, the Laborers filed a grievance against an ICI contractor for subcontracting what it contends to be on-site work to United Rentals.  Pl.'s Am. Mem. at 45.  United Rentals maintains that the Laborers' motion for summary judgment cannot be granted because whether their conduct "is coercive within the meaning of Section 8(b)(4) depends upon the object of the conduct.  Where, as here, the union signatory clause itself is unlawful under Section 8(e) and is not protected by the proviso, even peaceful means to enforce the clause, such as filing grievance [sic], constitutes [sic] coercion within the meaning of section

_____

[32] 29 U.S.C. §158(b)(4)(ii)(A)-(C).

40

8(b)(4)(ii)(A)." <u>Id.</u>

The Laborers argue that their conduct in seeking and obtaining the subcontracting

clause and MOU do not violate Section 8(b)(4) because some coercive activity above and

beyond "negotiating and receiving subcontracting provisions that are lawful pursuant to

Section 8(e)" is required to constitute an unfair labor practice under Section 8(b)(4).

Laborers' Mem. at 30; <u>see also</u> <u>Betal Env't Corp. v. Local Union No. 78, Asbestos, Lead</u>

<u>& Hazardous Waste Laborers</u>, 123 F.Supp.2d 156 (S.D.N.Y. 2000) ( "Section 303 does

not extend district court jurisdiction to pure violations of section 8(e).") Thus, the

subcontracting clause and MOU cannot constitute violations of Section 8(b)(4).

The Laborers further contend that Mr. Terry's call to United Rentals, in order to

discuss a collective bargaining agreement between United Rentals and the Laborers, does

not violate Section 8(b)(4).  Mr. Terry's testimony indicated that he did not recall at the

time that United Rentals was engaged in a labor relationship with the CLA.  After his

memory was refreshed, United Rentals performed the subcontracting job without

incident, and Mr. Terry never again spoke with anyone at United Rentals.  Laborers'

Mem. at 30-31.  The Laborers argue that this conversation was benign and the product of

genuine mistake, and that Mr. Terry's conduct simply does not rise to the level of

"threaten[ing], coerc[ing], or restrain[ing]" United Rentals, as is required by Section

8(b)(4).

Further, the Laborers state that the Kahl memorandum cannot constitute a violation

under Section 8(b)(4).  First, Mr. Kahl is executive director of ICI-LRD, and not a

41

representative or agent of the Laborers.  Also, the memorandum is neither coercive nor threatening; rather, it merely informs ICI Contractors about the content of the subcontracting clause and the MOU, both lawful agreements.  Id. at 31-32.  Finally, the Laborers argue that the grievance filed against an ICI contractor in order to enforce the subcontracting clause is merely an effort to require compliance with a lawful agreement, and is also neither threatening nor coercive.  Laborers' Reply/Response at 35.

We hold that none of the aforementioned activities by the Laborers constitutes an unfair labor practice under NLRA Section 8(b)(4); therefore, LMRA Section 303 is not violated.  Clearly, of primary importance here is our finding that the subcontracting industry proviso and the MOU are not unlawful.  Therefore, the Laborers have not violated Section 8(b)(4)(ii)(A), which pertains to agreements *prohibited* by Section 8(e).  With regard to Sections 8(b)(4)(ii)(B) and (C), the facts, when interpreted in the light most favorable to United Rentals, simply do not support their assertion that the Laborers engaged in a threatening, coercive, or restraining manner.  We note that "more than mere persuasion is necessary to prove a violation of § 8(b)(4)(ii)(B): that section requires a showing of threats, coercion, or restraints."  Those words . . . should be interpreted with 'caution' and not given a 'broad sweep[.]'"  Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. and Constr. Trades Council, 485 U.S. 568, 578 (1988).  Whether the Laborers' actions rise even to the level of "mere persuasion" is questionable.  The Kahl memorandum simply reiterates, in objective and nonthreatening language, the terms of the lawful agreement.  The filed grievance against an ICI contractor aims to enforce this

42

lawful agreement.  And Mr. Terry's phone call, without more, does not rise to the level of

threats or coercion.  We are presented with no evidence that the call was anything other

than a product of genuine mistake and United Rentals performed the traffic control job

without consequence.  We cannot conclude that the phone call, alone, constitutes coercion

in violation of Section 8(b)(4).  Therefore, we hereby GRANT Defendant Laborers'

Motion for Summary Judgment as to Count Four.


**F.      United Rentals's State Tort Claim**

United Rentals alleges in Count Five that ICI and the Laborers tortiously interfered

with its prospective economic advantage.  See, e.g., Gov't Payment Serv., Inc. v. Ace

Bail Bonds, 854 NE.2d 1205, 1209-10 (Ind. App. 2006).  This claim is based on the same

facts underlying United Rentals's other claims.

The Laborers argue that this claim must fail because, like the Indiana antitrust

claims, it is preempted by federal labor law.  Laborers' Mem. at 32-33.  The Laborers cite

Ehredt Underground, Inc. v. Commonwealth Edison Co., 90 F.3d 238 (7th Cir. 1996),

cert. denied, 519 U.S. 1056 (1997).  In Ehredt, the Seventh Circuit held that a state-law

tort claim against a union, brought based upon conduct alleged to violate Section 8(e),

was preempted:

> These activities are in the domain of federal labor law, and state regulation is
> forbidden whether federal law arguably protects or arguably prohibits the
> conduct. [citing Garmon] . . . If [damages awards were permitted] against

unions under state law, the federal regulatory system would come unraveled.[33]

In addition, the Laborers assert that United Rentals's tort claim fails because the underlying conduct is not illegal. This is a necessary element of the claim under Indiana law. See, e.g., Watson Rural Water Co. v. Indiana Cities Water Corp., 540 N.E.2d 131, 139 (Ind. Ct. App. 1989); Furno v. Citizens Ins. Co. of Am., 590 N.E.2d 1137, 1140 (Ind. Ct. App. 1992).

We accept the Laborers' argument here as correct. Under Ehredt precedent, federal labor law preempts such state law tort claims. Moreover, as the Laborers and ICI have committed no unlawful conduct under the NLRA, LMRA, or the Sherman Act, there is no independent illegal conduct to form the basis of such a claim. See, e.g., Johnson v. Hickman, 507 N.E.2d 1014, 1019 (Ind. Ct. App. 1987). Thus, we GRANT Defendants' Motion for Summary Judgment as to Count Five.

Because we have ruled in favor of Defendants and against the Plaintiff on all applicable Counts, we accordingly GRANT Defendant's Motion for Summary Judgment in its entirety and DENY Plaintiff's Motion for Partial Summary Judgment. All other pending motions in this cause are rendered moot. IT IS SO ORDERED.

---

[33] Id. at 241.

Date:    11/22/2006

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Anessa Abrams
SCHMELTZER APTAKER & SHEPARD P.C.
aa@saslaw.com

Edward J. Fillenwarth Jr.
FILLENWARTH DENNERLINE GROTH & TOWE
efil@fdgtlaborlaw.com

William R. Groth
FILLENWARTH DENNERLINE GROTH & TOWE
wgroth@fdgtlaborlaw.com

Ryan Michael Hurley
BAKER & DANIELS
ryan.hurley@bakerd.com

Gary Louis Lieber
SCHMELTZER APTAKER & SHEPARD P.C.
gll@saslaw.com

Geoffrey S. Lohman
FILLENWARTH DENNERLINE GROTH & TOWE
glohman@fdgtlaborlaw.com

Ira Michael Shepard
SCHMELTZER APTAKER & SHEPARD P.C.
ims@saslaw.com

Robert K. Stanley
BAKER & DANIELS
rkstanle@bakerd.com

Mark Richard Waterfill
DANN PECAR NEWMAN & KLEIMAN
mwaterfill@dannpecar.com